# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TIMOTHY GLICK and RENEE
GLICK,

   Plaintiffs,

    v.

KF PECKSLAND LLC, a Delaware
limited liability company, THE
BLEACHERS CORPORATION, a
Delaware corporation, and SAMUEL
KLEIN

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 12624-CB

## MEMORANDUM OPINION

Date Submitted: August 10, 2017
Date Decided: November 17, 2017

Kenneth J. Nachbar, Zi-Xiang Shen, MORRIS, NICHOLS, ARSHT & TUNNELL
LLP, Wilmington, Delaware; *Attorneys for Plaintiffs*.

P. Clarkson Collins, Jr., Albert J. Carroll, MORRIS JAMES LLP, Wilmington,
Delaware; *Attorneys for Defendants*.

**BOUCHARD, C.**

In this post-trial decision, the Court finds that Samuel Klein fraudulently induced Tim and Renee Glick into investing most of their life savings in a company he used as his personal checking account on the promise that they would obtain an ownership interest in another company called The Bleachers Corporation. Not long after the Glicks entrusted Klein with their savings, Bleachers became defunct.

Klein lived lavishly and portrayed himself to the Glicks as a highly successful businessman. He perpetrated the fraud by befriending the Glicks and gaining their confidence before offering them the "once-in-a-lifetime opportunity" to invest in a "white hot" Bleachers. He pitched the investment as a favor he was doing for the Glicks out of friendship so that Tim, a homebuilder in Jackson, Wyoming, could earn some easy money and have "skin in the game" to invest in a real estate joint venture with Klein, which never materialized. The Glicks were not sophisticated investors, as was readily apparent to Klein, and they expressed reservations about investing their savings in Bleachers. To close the deal, Klein promised to personally buy back their shares if things did not work out.

When the relationship ruptured, Klein reneged on his promise to buy back the shares, which the record shows he never intended to keep. This lawsuit followed. For the reasons explained below, the Glicks have met their burden under Wyoming law to prove fraudulent inducement and are entitled to damages for the amount they invested with Klein ($433,000) plus costs.

# I.    BACKGROUND

The facts recited in this opinion are my findings based on over 100 trial exhibits, deposition testimony, and live testimony from three fact witnesses who testified at trial:  Tim and Renee Glick[1] and Samuel Klein.  I accord the evidence the weight and credibility I find it deserves.

## A.    The Parties

Plaintiffs Tim and Renee Glick are married and reside together in Jackson, Wyoming, with their three children.[2]  Tim owns and operates a business that designs and constructs custom homes, named Dynamic Custom Homes ("Dynamic").[3]  Renee is a stay-at-home mom who does some photography and makes gelato.[4]  Tim attended Montana State University on a partial skiing scholarship, graduating in 1995.[5]  Renee graduated from the University of Massachusetts in 1999.[6]

Defendant Samuel Klein, who is in his early sixties, is a resident of Greenwich, Connecticut.[7]   Klein does not have a college degree, but has a

---

[1] I refer to the Glicks by their first names as they were used at trial for the sake of clarity. No disrespect is intended.

[2] Tr. 123 (Renee).

[3] Pre-Trial Order ("PTO") § II.1; Tr. 10-11 (Tim).

[4] Tr. 124 (Renee).

[5] Tr. 7-9 (Tim).

[6] Tr. 122-23 (Renee).

[7] Tr. 149-150 (Klein).

background in real estate and commercial property development, and portrays himself as a sophisticated and wealthy businessman.[8]  Before 2010, Klein primarily engaged in property development and management, focusing on hotels and healthcare facilities.[9]  He once pled guilty to a criminal misdemeanor for failing to maintain adequate nursing staff at a nursing home he operated, which resulted in restrictions being placed on his ability to operate nursing homes in New York.[10]

Defendant The Bleachers Corporation ("Bleachers") is a Delaware corporation that was formed in 2010.[11]  Bleachers ceased to operate as of February 2017 and is now defunct.[12]  Defendant KF Pecksland LLC ("KF Pecksland") is a Delaware limited liability company that Klein created to hold Bleachers shares.[13]  Klein admits he used KF Pecksland as his personal checking account.[14]

## B.    The Early Years of Bleachers

In 2010, Klein established Bleachers with the goal of streaming real-time video of sporting events using operated and stationary high-definition cameras.[15]

---

[8] Tr. 150-51 (Klein); Tr. 13-14 (Tim).

[9] Tr. 150 (Klein).

[10] Tr. 227-29 (Klein).

[11] JX004; PTO § II.3.

[12] PTO § II.3.

[13] JX036 Glicks202-03; PTO § II.4.

[14] Tr. 229 (Klein).

[15] Tr. 151-54, 277-78 (Klein).

Klein claims he started the company with an initial investment of approximately $3 million.[16] Over the next two and a half years, Bleachers beta tested its streaming technology at two private schools in Greenwich[17] and hired employees who had experience in sports technology from another sports startup.[18] Bleachers' business model evolved over time to focus on installing fixed cameras at private and boarding schools, where there is a high level of participation in sports and the students' families tend to be wealthy and do not live nearby.[19] Bleachers initially offered its service as a "live streaming subscription on either a monthly or an annual basis."[20] Bleachers ended 2013 with a shareholders' deficit of approximately $2,600,000.[21]

### C. Klein Hires Tim to Build a Home in Jackson, Wyoming

Klein and Tim first met in 2008, when Tim bid on a vacation home construction project for Klein.[22] In 2013, Klein called Tim to discuss building a home on a different piece of property in Jackson, Wyoming.[23]

---

[16] Tr. 151-54, 277-78 (Klein); *see also* JX095 at 33-34 (Mommsen Dep.).

[17] Tr. 154 (Klein).

[18] Tr. 154 (Klein).

[19] Tr. 153 (Klein).

[20] JX095 at 73-74 (Mommsen Dep).

[21] JX006 BL114.

[22] Tr. 11-12, 81-82 (Tim).

[23] Tr. 12 (Tim).

In or around October 2014, Dynamic entered into a contract with Klein's company, Sleeping Indian III ("Sleeping Indian"), for Dynamic to serve as the general contractor to build a 8,100 square foot custom home for Klein.[24] The contract anticipated a maximum price of roughly $5.8 million, with price overruns to be borne by Dynamic.[25] Construction began in October 2014. Klein flew out to Jackson on a private jet with his daughters for a ground breaking ceremony on the property and photographed the event with a $22,000 camera he had just purchased.[26]

### D. Klein Befriends the Glicks and Discusses Bleachers

In November 2014, Klein flew out to Jackson, again on a private jet, with several family members.[27] Renee prepared some gelato for Klein for his arrival.[28] Klein invited Tim to ski with his family at Grand Targhee, a Wyoming ski resort, and hired Tommy Moe, the former U.S. Olympian skier, as a guide for the ski trip.[29]

Throughout late 2014, Klein and Tim spoke several times a week via text, e-mail, and on the phone.[30] Tim soon considered himself to be Klein's good friend, speaking with him "maybe three or four times each week" and discussing "almost

---

[24] Tr. 11-13 (Tim); Tr. 179-80, 256-57 (Klein).

[25] PTO § II.5, Tr. 180-82 (Klein); JX100 at 21, 122 (Tim Dep.).

[26] Tr. 12-13, 83 (Tim); Tr. 189-90, 256-57 (Klein).

[27] Tr. 14 (Tim).

[28] Tr. 124-125 (Renee).

[29] Tr. 83 (Tim).

[30] Tr. 15-16 (Tim).

anything that guy friends talk about,"[31] including business, cars, their personal lives, and Tim's business model and how it could be improved.[32]

In December 2014, Klein invited Tim and Renee to a large party at a house he was renting in Jackson at the high-end Amangani Resort.[33] This was the first time Renee met Klein. She brought two flavors of her gelato at Klein's request.[34] During the party, Klein showed some of the guests videos Bleachers had taken.[35]

After the party, the Glicks, Klein, and his girlfriend went to dinner.[36] They discussed potential business opportunities for the Glicks.[37] Klein flattered Renee, telling her that her gelato was better than any he had ever tasted in Italy and that she should commercialize it.[38] They also discussed Bleachers, which Klein had identified to Tim as the "source of his current income."[39] Klein described Bleachers as "a new and upcoming business, that it was just skyrocketing," and told the Glicks

---

[31] Tr. 15-16 (Tim); *accord* Tr. 204-205 (Klein).

[32] Tr. 16-17 (Tim); Tr. 261 (Klein).

[33] Tr. 124-25 (Renee); *accord* Tr. 18-19 (Tim).

[34] Tr. 124-25 (Renee).

[35] Tr. 189 (Klein).

[36] Tr. 18-19 (Tim); Tr. 124-125 (Renee).

[37] Tr. 18-22 (Tim).

[38] Tr. 124-25 (Renee).

[39] Tr. 14-15 (Tim).

"schools were lining up to -- to be a part of Bleachers."[40] The discussion piqued the Glicks' interest in Bleachers.[41]

### E. Tim and Klein Begin Exploring Business Opportunities Together

In late 2014 through early 2015, Tim and Klein spoke about the possibility of working together on a real estate joint venture, considering it a natural fit with Tim's building experience and Klein's work on real estate projects.[42] Klein and Tim began to discuss the terms of a joint venture more concretely in February 2015, and explored a speculative housing project, *i.e.*, purchasing a lot to build on and starting construction before finding a buyer.[43]

In preparation for the potential venture, Klein "walked Tim through hours of how construction financing works,"[44] and Tim looked into recent purchases made by other builders as well as available lots in Teton County.[45] In response to Tim's analysis of the potential properties, Klein was consistently positive about Tim's knowledge of the local market.[46] Both parties testified at trial that they were

---

[40] Tr. 18-20 (Tim); *accord* Tr. 126 (Renee).

[41] Tr. 14-15 (Tim); Tr. 126 (Renee).

[42] Tr. 17-18 (Tim).

[43] JX208 (email from Klein seeking to discuss investment in potential lot).

[44] Tr. 185 (Klein).

[45] JX205.

[46] JX212; Tr. 25-26 (Tim); *see also* JX007; JX213.

committed to the project,[47] but Klein's trial testimony was inconsistent with his deposition, where he testified that, by January or February 2015, he "just didn't trust the guy [Tim]" and "wanted to start working Tim out of the project" of constructing his home.[48]

In early March 2015, Klein and Tim put in a "low-ball offer" on a piece of property, which was rejected.[49]  Once Klein and Tim began working on their potential joint venture, Klein told Tim he needed to have "skin in the game,"[50] but Tim did not have the capital to invest in such a venture.[51]

### F.    Klein Directs Tim to Inflate Withdrawals on Sleeping Indian's Loan Account with the Bank of Jackson Hole

Sleeping Indian, the entity that owned the property on which Tim was building a house for Klein, obtained a loan from the Bank of Jackson Hole to finance the construction.[52]  In February 2015, while Tim and Klein were discussing their potential real estate joint venture, Klein directed Tim to inflate the progress of the construction of Klein's Jackson residence in order to secure the release of additional

---

[47] Tr. 20 (Tim); Tr. 205 (Klein).

[48] JX096 at 83-84 (Klein Dep.).

[49] Tr. 26 (Tim); *accord* JX0211; JX0213.

[50] Tr. 185 (Klein).

[51] Tr. 39 (Tim).

[52] In a construction loan, money is typically released as a builder certifies the degree of completion of the construction to the homeowner's representative and the bank.  Tr. 27-28, 110 (Tim).

funds from the bank, which went to Klein for his personal use.[53]  Specifically, Klein directed Tim to inflate the degree of completion on the project in the certifications submitted to the bank (while submitting accurate certifications to the homeowner's representative to conceal the overstatements) and to transfer the inflated amounts to KF Pecksland, Klein's company, or to Annie Klein, Klein's daughter, immediately after Dynamic received the draws from the bank.[54]

Apart from enriching Klein, this scheme hurt Tim by reducing the amount of funds available from the bank for the actual costs of construction, placing Tim at Klein's mercy to make good on the difference.  Bank records confirm that the total amount of excess funds that Dynamic transferred to KF Pecksland was $2,423,608.[55] Tim credibly testified that he did not "pocket any of the inflated amount."[56]

### G.    Bleachers' Performance Going into 2015

In 2014, in an effort to generate higher revenues, Bleachers modified its business model from a subscription service with revenues coming from users (*i.e.*, parents and students) to a school-pay model selling its services directly to schools.[57]

---

[53] JX066; Tr. 28 (Tim); Tr. 189, 229 (Klein).

[54] Tr. 28-29, 38 (Tim); Tr. 229 (Klein); JX066; JX207.

[55] JX066 Glicks0265 (top chart).

[56] Tr. 111 (Tim).

[57] JX095 at 72-74 (Mommsen Dep.).

The company also secured additional funding and hired additional employees.[58] Despite these initiatives, Bleachers generated only $135,528 in revenue and suffered a net loss of $2,493,700 for the year ended December 31, 2014.[59] It was apparent going into 2015 that Bleachers would need more capital to survive.[60]

### H.    Klein and the Glicks Discuss an Investment in Bleachers

In early 2015, Klein began to discuss having the Glicks invest in Bleachers.[61] Klein told the Glicks that Bleachers was "successful" and "white-hot," and that he was offering the opportunity to invest "as a favor" to them so that they could use the profits from Bleachers to "invest into the real estate venture together with [him]."[62] Klein led Tim to believe that Bleachers was making money and was responsible for Klein's income and lavish lifestyle.[63]

In April 2015, Klein told Tim about an opportunity Bleachers had to stream coverage of sports teams for Division III colleges[64] and about "vast" opportunities it had in Australia.[65] Klein also told the Glicks that the Australian market was

---

[58] Tr. 158-59, 191-92 (Klein); JX095 at 17 (Mommsen Dep.); JX05 BL174; JX06 BL114-15.

[59] JX006 BL113; Tr. 110-11 (Tim).

[60] JX006 BL113; JX095 at 76, 79-80 (Mommsen Dep.).

[61] Tr. 126 (Renee); Tr. 189 (Klein).

[62] Tr. 39-40, 43-44 (Tim); Tr. 263 (Klein).

[63] Tr. 14-15 (Tim).

[64] Tr. 53-54 (Tim); Tr. 172-73 (Klein).

[65] Tr. 192 (Klein); *see also* Tr. 45-46 (Tim).

"untouched" and promising for Bleachers.[66] During this period, Klein was speaking regularly with Richard Stokes, the chairman of the Australian Boarding School Association ("ABSA").[67]

Despite the optimism Klein expressed to the Glicks about Bleachers' prospects, the Glicks voiced reservations about investing in it, particularly since the amount Klein was asking for—$250,000—was most of their life savings.[68] To reassure them, Klein told Tim that they would "make millions" and that he would "personally guarantee" their investment:

> Q. And what did Mr. Klein say in response?
>
> A. He – he said, "Don't worry about this Tim. You're going to make millions. This thing is taking off like a – like a rocket. You're going to make so much money on that" – that he personally guaranteed me – he knew it was such a good deal that he personally guaranteed me that he would buy back our initial investment in Bleachers if anything went wrong.
>
> Q. Did Mr. Klein say that once, or more than once?
>
> A. No. He said it multiple times to me.[69]

Klein once again repeated this personal guarantee during a call when Tim again expressed reservations about making the investment:

---

[66] Tr. 45-46, 51 (Tim).

[67] Tr. 174 (Klein).

[68] Tr. 41, 60 (Tim).

[69] Tr. 41-42 (Tim).

Q. Do you have any particular recollection of any specific time that Mr. Klein told you that he would buy back your initial investment if something were to go wrong?

A. I do. One specific day, before we made our initial investment into Bleachers, I was driving down the access road of Spring Creek Ranch, down from Mr. Klein's construction site. And I was speaking to Mr. Klein. And I told him that, you know, I was really nervous about this. And once again, he said, "Tim, don't worry about this. This is a no-brainer. It's a once-in-a-lifetime opportunity. Invest your money. I will personally guarantee that you will not lose money, and I will buy back your stock if anything is to happen."[70]

Renee did not hear Klein say that he would guarantee their investment, but she confirmed that Tim told her about the guarantee at the time.[71]

## I. The Glicks Make Their First Investment in Bleachers

On April 10, 2015, Klein sent an e-mail to Tim offering to sell an option to purchase 1% of the outstanding shares of "Kf bleachers stock."[72] After seeing Klein's email, Tim asked whether there was a "cliff note or 'for dummies' version of this document" because he and Renee "don't ready [*sic*] many of these types of documents or any for that matter."[73] Klein offered to speak to the Glicks and walk them through the agreement.[74]

---

[70] Tr. 42-43 (Tim).

[71] Tr. 146 (Renee); *see also* Tr. 43 (Tim).

[72] JX010; JX096 at 38-40 (Klein Dep.).

[73] JX010.

[74] *Id.*

The next day, Klein sent Tim a chart displaying Bleachers' capitalization as of April 1, 2015.[75] On April 13 and 14, Klein sent Tim e-mails suggesting that Morris Offit, whom Klein represented as a successful and savvy investor, was interested in investing and helping develop Bleachers.[76]

On April 14, 2015, Tim and Renee received a Purchase and Sale Agreement (the "First Purchase Agreement"). It provided that KF Pecksland would sell 688.184 shares of Class A Common Stock of Bleachers to the Glicks for $250,000.[77] Klein testified that he asked for $250,000 because he was not looking "to do hand-holding" for a lower investment.[78]

The Glicks signed the First Purchase Agreement the same day they received it.[79] In a cover email to which the executed document was attached, Tim said to Klein: "Thank you Sam, I greatly appreciate it."[80] Tim read the agreement before signing it but testified that he "didn't understand" it.[81] Renee did not read the agreement.[82] Later that day, Klein sent Tim an email stating that he had "assigned

---

[75] JX011.

[76] Tr. 66-67 (Tim); JX014-15.

[77] JX012.

[78] Tr. 196-97 (Klein).

[79] JX016.

[80] *Id.*

[81] Tr. 45 (Tim).

[82] Tr. 145-46 (Renee).

my right in the stock to you and renee."[83]  The Glicks wire transferred $250,000 to KF Pecksland three days later, on April 17.[84]

In deciding to invest in Bleachers, the Glicks took the information Klein provided them to heart and conducted limited research:  they did not consult with an attorney, did not receive financial statements or ask for information regarding the valuation of Bleachers, and did not seek advice from their personal financial advisor at Morgan Stanley.[85]  Tim briefly discussed the investment with his father, a retired commodities trader, and "might have" done internet research on Bleachers, but otherwise took Klein at his word.[86]

### J.  Klein and the Glicks Discuss the Joint Venture and Making a Second Investment in Bleachers

On April 21, 2015, Klein sent an e-mail to update Tim on Bleachers' efforts to enter the Division III college sports market, stating that "[I] thought I had a productive day . . . 400 schools!!"[87]  Tim responded that "[t]hats great!!!"[88]

Throughout April and early May, Klein continued to tell Tim about opportunities Bleachers had in Australia, saying that Australia was a natural market

---

[83] JX013; *see also* JX019.

[84] Tr. 44, 93 (Tim).

[85] Tr. 72-76, 81-83 (Tim).

[86] Tr. 76-79 (Tim).

[87] JX023.

[88] *Id.*

for Bleachers because Australia is "a sports-crazy nation," that "nobody was doing this" in Australia, that it was a "wonderful market without competition," and that he and Bleachers were "going to Australia."[89]

On May 3, 2015, after visiting a potential office space for their joint venture, Tim went with Klein to Greenwich.[90] Klein arranged the trip so that Tim could examine the site of a potential demolition project for Morris Offit, whom Klein portrayed as a good friend and previously identified as a potential investor in Bleachers.[91] During the trip, Tim visited a lot Offit was purchasing next to his home with an old house on it that Offit wanted to demolish.[92]

On May 4, 2015, Klein took Tim out to dinner in Greenwich in a Ferrari.[93] Klein told Tim while driving in the car that the Glicks' initial investment in Bleachers had doubled in value.[94] Tim was excited, explaining: "how many times in your life can you double your money, $250,000, in two, two and a half weeks."[95]

---

[89] Tr. 51 (Tim), 66 (Tim), 174 (Klein), 209 (Klein).

[90] JX024.

[91] Tr. 47, 66 (Tim); Tr. 161 (Klein).

[92] Tr. 47 (Tim); Tr. 200-201 (Klein).

[93] Tr. 48 (Tim); Ans. at ¶ 19 (Dkt. #10); JX096 at 112-13 (Klein Dep.).

[94] Tr. 48 (Tim).

[95] Tr. 48 (Tim).

Klein also talked about other investors and told Tim that Offit "was going to invest $150 million into Bleachers."[96] Tim thought he had "gotten on the rocket."[97]

On May 5, 2015, while standing in Klein's kitchen in Greenwich, Klein told Tim that a relative of his had to sell his Bleachers shares to make a down payment on a house.[98] Klein offered to sell the shares to Tim, again "as a friend," telling him: "'Tim, here's another opportunity if you want it. I'm offering it to you. Otherwise, I would buy it, buy the stocks.'"[99] The amount of the investment was $183,000. Klein told Tim that he "needed to give him an answer immediately."[100] Klein reiterated that Offit was planning to invest $150 million, telling Tim that the Glicks would have to invest "immediately, prior to Offit investing his $150 million, because if Offit invested his $150 million first" then Tim would be unable to purchase at the current valuation.[101]

Tim thought he would be purchasing Bleachers shares from Klein's relative, but he ended up purchasing an interest in KF Pecksland from Klein himself.[102]

---

[96] Tr. 48 (Tim); *see also* Tr. 66-67, 90-91 (Tim).

[97] Tr. 48 (Tim).

[98] Tr. 49 (Tim).

[99] Tr. 49 (Tim).

[100] Tr. 49-50 (Tim); *see also* Tr. 270-71 (Klein).

[101] Tr. 50-51 (Tim).

[102] Tr. 49-50 (Tim); JX036.

Klein's reference to a relative buying a house was a fabrication. As Klein admitted in his deposition, the money went to Klein, who "had bills to pay."[103]

On May 6, 2015, Tim's last day in Greenwich, Klein forwarded Tim an e-mail stating that Offit wanted Klein to "send Bleachers material" to a banker at Goldman Sachs and to a man with a daughter at the "Hill School in Princeton" who "loves the idea of Bleachers."[104]

On May 9, 2015, after learning that she and Tim were getting another chance to invest in Bleachers and that they already had doubled their initial investment, Renee sent a message to Klein, saying "[y]ou are too kind! Thank you!!!!!! Thanks for returning my husband also."[105] The next day, Klein texted Renee: "Happy mommies day Renee, your man is a good man."[106] In truth, Klein harbored doubts about Tim at this point in time.[107]

## K. The Glicks Make a Second Investment

Klein imposed a May 13 deadline for the Glicks to make their second investment,[108] telling them it "was imperative" that the deadline be met or they

---

[103] JX096 at 121 (Klein Dep.).

[104] JX025.

[105] Tr. 129 (Renee); JX008 Glicks600.

[106] JX008 Glicks600.

[107] JX096 at 83-84 (Klein Dep.).

[108] Tr. 54 (Tim).

17

"could be messing something up for him and for Bleachers."[109]  The Glicks "were liquidating the rest of everything [they] owned" to meet the deadline but were running into problems with their broker.[110]  Realizing they would not make the deadline, Renee texted Klein in a panic at 2:45 p.m. on May 13:

> It's Renee……
> I'm freaking out.  Tim is freaking out.  We……are freaking out.
>
> …..if only there were a few more hours in the day…..and….we didn't have the time-difference of 2 hrs.  We'll be lucky if neither of us puke tonight….or sleep.[111]

Klein replied that he would call the Glicks, stating that "[i]t's quite serious . and I'm stunned at what occurred."[112]  Renee continued to text with Klein, noting how they had requested the money but that since it was "diversified" and "nearly all of our stock" it was taking additional time to transfer.[113]

At night on May 13, Klein called Tim and Renee, who spoke to Klein together on a speakerphone.  Renee recalled that Klein started "berating" and "scolding" the Glicks, saying that the "wire transfer not going through was a really big deal" and "very serious." [114]  Tim similarly recalled that Klein yelled at the Glicks for several

---

[109] Tr. 133 (Renee).

[110] Tr. 133 (Renee).

[111] JX008 Glicks601.

[112] *Id.*

[113] *Id.* Glicks602.

[114] Tr. 134 (Renee).

minutes about how they "screwed everything up" before he said that he would be able to buy them an extra day.[115]

At some point during the call, Renee asked Klein whether or not the Glicks should still transfer the $183,000 to Klein, or if it should be rerouted back to them.[116] Klein immediately changed his tone. He suddenly started stressing how the Glicks would "make millions of dollars" and that they "were going to need a financial planner" to help them manage their new-found wealth.[117] He reiterated that Offit was "scheduled to invest $150 million" in Bleachers and said that he was "going to help take Bleachers public on the stock exchange."[118]

After the call, Klein texted the Glicks the name of Quincy Cotton, whom Klein represented to be a financial planner and estate attorney who "was going to set up [the Glicks'] future estate and money safety stuff."[119] Renee asked if Cotton would work with them "even though we aren't 'high net worth individuals' YET?"[120] Klein replied "you are and she will."[121]

---

[115] Tr. 55-56 (Tim).

[116] Tr. 134-35 (Renee).

[117] Tr. 56-57 (Tim); *accord* Tr. 134-135 (Renee).

[118] Tr. 57 (Tim); *accord* Tr. 135 (Renee).

[119] Tr. 135-36 (Renee); *accord* JX008 Glicks602-04.

[120] JX008 Glicks603.

[121] *Id.* Glicks604.

On May 14, 2015, before reviewing any documents for the transaction, the Glicks wired $183,000 to Klein, whom Tim still considered a "very good friend."[122] Klein then sent Tim an e-mail with the subject line "183k for conversion to stock which will be issued in both renee and timothy glick names."[123]

## L. Continued Discussions Regarding Bleachers Before the Glicks Sign the Second Purchase Agreement

In May 2015, Klein updated the Glicks on Bleachers' attempted entry into Australia, reiterating that its opportunities were "vast" and "huge."[124] On May 20, 2015, Klein sent Tim an e-mail implying that Bleachers had signed several schools in Australia: "We are going! Got 6 schools to start."[125] Tim replied "So cool!"[126]

On May 31, 2015, Klein sent Tim another e-mail stating that he just got off Skype "with [the] aussies" and had "3 schools now with 2000 students per school minimum and will have 3 others this week."[127] Tim replied "Nice work rain

---

[122] Tr. 57-58 (Tim).

[123] JX026.

[124] *See* JX028; Tr. 192, 208-10, 263 (Klein).

[125] JX028.

[126] *Id.*

[127] *Id.*

maker."[128]   Klein responded that it was "funny you [Tim] know more than Ceo haha."[129]

Klein's representations in the e-mails that Bleachers had signed up multiple schools in Australia were false.[130]   Bleachers ultimately signed up only one Australian school (Methodist Ladies' College), and only for a beta test.[131]   Klein blamed Richard Stokes, his contact at the ABSA, for providing him with inaccurate information that he had conveyed to Tim.[132]   As of May 2015, Bleachers did not even have the technological capability to provide its service in Australia.[133]

On May 26, 2015, Klein sent an e-mail to Tim reflecting the "economics" of the Glicks' total investment but, instead of reflecting a direct purchase of shares in Bleachers, it depicted that the Glicks would receive "ownership of KF Pecksland Equivalent to [a] New Share amount."[134]   Tim responded that the "numbers seem to make sense to me… at least the amount Renee and I have to put in and the purchase

---

[128] JX032.

[129] JX033.

[130] JX096 at 137, 140-41 (Klein Dep.).

[131] *Id.* at 135-41.

[132] *Id.* at 136-37.  As of May 2015, Bleachers had not even entered an agreement with ABSA.  *See* JX041; JX005 at BL176 (reflecting that ABSA contract was not signed until July 2015).

[133] JX096 at 138-40 (Klein Dep.) (explaining problems with "latency of the signal" in Australia).

[134] JX029.

price."[135] Klein replied that "its correct…I'll have [my attorney] lipari issue the shares."[136] Klein's attorney, Joseph Lipari, was a shareholder and a board member of Bleachers at the time.[137]

On June 1, 2015, Klein sent Tim several documents, namely a Purchase and Sale Agreement (the "Second Purchase Agreement"), an Amended and Restated Limited Liability Company Agreement of KF Pecksland LLC, and an Assignment.[138] The Assignment reflects that Klein assigned to the Glicks a 15.731% interest in KF Pecksland in exchange for $433,000, *i.e.*, the total amount that the Glicks had invested with him in two installments.[139] The Second Purchase Agreement recites that Klein was the 100% owner of KF Pecksland.[140] The same day they received the documents, the Glicks signed and returned them to Klein.[141]

According to Klein, the documents for the first round of the Glicks' investment were incorrect and needed to be restructured to reflect that the Glicks were purchasing an interest in KF Pecksland, the only asset of which was Bleachers

---

[135] JX030.

[136] *Id.*

[137] JX011; JX095 at 20 (Mommsen Dep.).

[138] JX036.

[139] *Id.* Glicks200.

[140] *Id.* Glicks209.

[141] JX036.

22

stock, and not a direct interest in Bleachers.[142]  There were no negotiations or discussions concerning the Second Purchase Agreement.[143]

On the evening of June 1, 2015, Tim texted Klein to inquire about the status of Offit's investment in Bleachers:  "Renee was wondering if offit closed.  I didn't think that was happening for another week or two."[144]  Klein replied "[n]ot yet" and that he would let Tim "know the same day it happens."[145]  Offit ultimately invested only $650,000 in Bleachers—a small fraction of what Klein had represented he would invest.[146]

**M.      The Relationship Between the Glicks and Klein Collapses**

On June 3, 2015, Renee texted Klein:

Hey there!
So, I was just talking to Tim and……he was all stressed out.  But I wanted to make sure that you knew that the money you have of ours is everyyyyyything we had……plus some.  I just wanted to make that clear…. :-).  (No pressure).  LOL![147]

Renee testified that the text was prompted by the fact that Klein had defaulted on payments he owed Tim for constructing his Jackson residence and that Klein had all

---

[142] Tr. 201-02 (Klein).

[143] Tr. 204 (Klein); Tr. 46, 72-73 (Tim).

[144] JX033 KFP423.

[145] *Id.* KFP424.

[146] Tr. 59 (Tim); JX096 at 128 (Klein Dep.); JX095 at 64 (Mommsen Dep.).

[147] JX008 Glicks604.

of the Glicks' "personal money."[148]  Renee's text prompted Klein to call Tim and yell at him because he thought that it was "extremely inappropriate" for Renee to reach out to him.[149]

In mid-2015, Klein and Tim formed an entity for their joint venture, which they named Bond Realty Group.[150]  In early June 2015, Klein and Tim signed an office lease for Bond Realty Group, and explored potential projects in the Jackson area.[151]

In August 2015, Tim's relationship with Klein ruptured after Tim billed Klein $80,000 for a deposit for stone to be used to build Klein's Jackson residence.[152]  At the time, Klein had stopped making payments on the house and was $880,000 behind in his payments, and Tim did not have funds to purchase the materials.[153]  When he spoke to Klein about the matter, Klein threatened to sue him "with his high-priced New York lawyers."[154]

On August 27, 2015, Klein's lawyer sent two letters to Tim.  One letter set forth certain requirements Klein was demanding as a condition to permit Tim to

---

[148] Tr. 137 (Renee).

[149] Tr. 137 (Renee).

[150] PTO § II.13; Tr. 186 (Klein).

[151] PTO § II.13.

[152] Tr. 61-62 (Tim).

[153] Tr. 62 (Tim).

[154] Tr. 63 (Tim).

complete the construction of his home.[155] The other letter formally terminated their real estate joint venture.[156] Believing he could not defend himself because Klein "had all [his] money," Tim signed and returned both letters to Klein's lawyer on August 28.[157]

The evening before, on August 27, 2015, Tim texted Klein and asked him if he had "a timeline on when my bleachers stock would be sold."[158] Klein replied that the Glicks' stock "would be purchased at the – next event."[159] Later, on December 23, Klein told Tim during a phone conversation that he would buy out the Glicks' interests by the end of January 2016, at which point he also would make Tim whole on the construction payments for his Jackson residence.[160]

## N.     Additional Transactions Involving KF Pecksland

At various times between October 2015 and April 2016, Klein sold interests in KF Pecksland to four other investors for approximately $1.2 million.[161] In March

---

[155] JX051 KFP595-96.

[156] *Id.* KFP597-98.

[157] Tr. 63-64 (Tim); JX051 KFP594.

[158] JX050; Tr. 64 (Tim).

[159] Tr. 65 (Tim).

[160] Tr. 65 (Tim).

[161] JX001; Tr. 178, 278 (Klein).

2017, some of these investors sued Klein for fraud in connection with his sale of interests in KF Pecksland to them.[162]

In 2014 and 2015, Klein undertook a series of transactions that culminated in obligating KF Pecksland to pay $6 million to Payton Lane Nursing Home, Inc. ("Payton Lane"), an entity Klein owned, in exchange for a mortgage on the home Tim was building for Klein in Jackson.[163] The mortgage was "junior and subordinate to" Klein's construction loan in favor of Bank of Jackson Hole.[164] Klein claimed at trial that he was working to unwind this transaction because KF Pecksland could not afford to pay the promissory note.[165]

### O. Tim Stops Working on Klein's Jackson Residence and Bleachers Shuts Down

On April 4, 2016, Dynamic sent Sleeping Indian a notice that it was terminating their contract and stopping construction on Klein's Jackson residence.[166] Since the summer of 2016, the Glicks and Klein have been engaged in litigation in Wyoming relating to construction of the Jackson residence and in Connecticut

---

[162] Tr. 279-80 (Klein).

[163] JX300-05.

[164] JX305 ¶¶ 1-2, 4. The mortgage made reference to a "Secured Promissory Note" that was executed at the same time but was not included in the record. *Id.* ¶ 4.

[165] Tr. 221-22 (Klein).

[166] JX069; Tr. 218 (Klein).

relating to cash payments Klein made to Tim.[167] As of February 2017, Bleachers

ceased operations.[168] Its stock is worthless.

## II. PROCEDURAL POSTURE

On April 28, 2016, the Glicks filed an action against Bleachers and KF

Pecksland to inspect books and records.[169] KF Pecksland offered to produce certain

documents and represented that certain categories of documents did not exist,

including a "statement regarding the status of the business and financial condition

of KF Pecksland" and a "current balance sheet for the company, [and] any recently

filed federal, state, and local income tax returns."[170]

On August 5, 2016, the Glicks filed their complaint in this action against KF

Pecksland, Bleachers, and Klein, asserting three claims.[171] Count I asserts a claim

for breach of the First Purchase Agreement against all defendants for failing to

deliver $250,000 worth of Bleachers stock to the Glicks.[172] Count II asserts a claim

for breach of fiduciary duty against Klein in connection with his management of KF

Pecksland.[173] Count III asserts a claim for fraudulent inducement against Klein and

---

[167] PTO § II.22; Tr. 218-19 (Klein).

[168] PTO § II.3; Tr. 220 (Klein); JX095 at 5-6 (Mommsen Dep.).

[169] Compl. (Dkt. 1).

[170] JX081 ¶ 10.

[171] Compl.

[172] *Id.* ¶¶ 37-45.

[173] *Id.* ¶¶ 46-51.

27

KF Pecksland.[174]  On April 19, 2017, the parties stipulated to dismiss Bleachers from the action without prejudice.[175]

On April 21, 2017, KF Pecksland and Klein filed a motion *in limine* seeking to exclude certain documents and testimony.[176]  The Court denied the motion *in limine*, but permitted the parties to assert any evidentiary objections in their post-trial briefs, with the understanding that any objections not presented in the post-trial briefs would be waived.[177]  Evidentiary objections that were asserted in Klein's post-trial brief are resolved in a separate order filed with this memorandum opinion.

Trial was held on April 26, 2017.  During the post-trial argument, the Glicks abandoned Count I of their complaint because the relief they sought—the issuance of $250,000 worth of Bleachers shares—was pointless given that Bleachers was defunct and its shares worthless.[178]

## III.    ANALYSIS

This case is a classic "he said-she said" dispute where issues of credibility are paramount.  Thus, before analyzing the claims, I address the credibility of the witnesses who testified at trial.  In reaching my conclusions about credibility, I

---

[174] *Id.* ¶¶ 52-58.

[175] Stipulation and Order Dismissing Def. (Dkt. 58).

[176] Defs.' Motion *in limine* (Dkt. 59).

[177] Tr. 4-6.

[178] Post-Trial Tr. 50-51.

accord particular weight to the consistency of the witnesses' testimony with the written record and their prior statements, and to my observations of their demeanor as they testified. As a general matter, both of the Glicks were highly credible but Klein was not at all credible.

Throughout the case, but particularly during his cross examination, Klein was evasive and would claim faulty recollection or delay answering until he was confronted with a document or prior statement. For instance, in response to a simple question about whether he had signed documents under oath without reading them, Klein sought to evade the question before being confronted with his deposition testimony where he admitted doing so.[179] Similarly, in response to a question about whether he had ever stolen money from a business partner, Klein denied doing so, and then responded that "[y]ou're going to point me to something that shows that I did steal money from a business partner. So I'm just waiting."[180]

Klein admitted in his trial testimony that he had been sanctioned by then-Vice Chancellor Strine in a previous case. To my astonishment, however, he denied ever seeing the transcript of the hearing in which he was sanctioned and at one point

---

[179] Tr. 225-26 (Klein).

[180] Tr. 237-38 (Klein).

denied knowing what the sanction was for, saying he "thought [it was] for not showing up."[181]

Klein flip-flopped in his testimony about misusing the proceeds from his construction loan account with the Bank of Jackson Hole. In his deposition, Klein falsely denied that KF Pecksland ever received cash from Dynamic.[182] At trial, he admitted he directed that money be transferred from Dynamic to KF Pecksland each month beginning in February 2015.[183] Klein also denied at trial ever "misapply[ing] proceeds from bank loans before," but had admitted doing so in deposition testimony from the same action in front of then-Vice Chancellor Strine.[184]

In contrast to Klein, the Glicks were forthcoming in their testimony at trial, and their demeanor on the stand suggested that they were answering honestly. Tim

---

[181] Tr. 239, 241-42 (Klein). For context, the transcript was from a hearing in *FHC Danbury LLC v. LJA (Danbury), LLC,* C.A. No. 2855-VCS (July 20, 2007), in which then-Vice Chancellor Strine imposed sanctions on Klein after finding that Klein "stole" $178,000 from the account of a business owned 50/50 by Klein and another person "in clear violation of" the Court's status quo order. JX201 at 20, 27. Klein did not attend the hearing, but the Court directed that his counsel, a partner at Richards, Layton & Finger, advise Klein about the hearing. JX201 at 32. In the order accompanying this decision, I sustain Klein's objection to the introduction of the transcript as extrinsic evidence of character under Rule 404, and I do not consider it for that purpose in this decision.

[182] Tr. 230 (Klein) ("Question: Did KF Pecksland ever receive cash from Dynamic Custom Homes? . . . Answer: No."); *see also* JX096 at 72 (Klein Dep.).

[183] Tr. 229, 232-34 (Klein).

[184] Pls.' Post-Trial Opening Br. Ex. A at 194-201 (Klein admitting that he had filed an affidavit with a bank requesting $300,000 to purchase furniture and fixtures for a hotel, but that the money instead was directed to one of his companies "probably because we were due money" and "money is a fungible commodity.").

acknowledged his wrongdoing with respect to inflating the draws on the construction loan account[185] and was sincere in his retelling of each of his interactions with Klein and how he discussed many of those events with Renee in real time. Although Renee's personal knowledge of the relevant events was more limited than Tim's, she testified clearly as to what she observed, did not observe, and did not adequately recall.[186]

The Glicks' version of events also better comported with the written record, whereas many of Klein's statements were inconsistent with documentary evidence, his deposition testimony, or both. For example, although Klein denied at his deposition pressuring the Glicks[187] or setting a hard May 13, 2015 deadline for them to make the $183,000 investment,[188] Klein was forced to admit at trial that he did set such a deadline,[189] and text messages[190] between the parties show that Klein

---

[185] JX100 at 129-31 (Tim Dep.). Although Tim's role in this scheme is troubling, there is no evidence to suggest he personally profited from it. In reality, it caused him great harm.

[186] *See, e.g.,* Tr. 139-42, 145-46 (Renee).

[187] JX096 at 111 (Klein Dep.).

[188] *Id.* at 110-11, 120 (Klein Dep.) ("[I] told them that they didn't have to do it. I told Tim he didn't have to do it. If they didn't wire and it was problematic, we don't need to do this, but I said it is a credibility issue to me if you are not going to do it, so just let me know one way or the other.").

[189] Tr. 270-271 (Klein).

[190] JX008 Glicks601-602 (Klein texting that "[i]t's quite serious . and I'm stunned at what occurred. [JP] Morgan never wired" and that "I'm having a credibility issue. in the worst way we can't have this go south").

definitely pressured the Glicks. This supports the Glicks' testimony that Klein told them, among other things, that they were "putting Bleachers in great danger" by failing to meet the deadline.[191]  Similarly, as noted above, Klein testified during discovery that KF Pecksland never received cash from Dynamic, only to admit at trial that this was false after being confronted with emails from the bank documenting the transfers to KF Pecksland.

In sum, in the instances discussed above and many others, Klein's evasive and inconsistent responses gave me the distinct sense that there was little chance of getting a straight answer from him and that he was willing to say whatever was convenient at the moment without regard for the truth. Tim and Renee, on the other hand, were both very credible witnesses.

### A.     The Fraudulent Inducement Claim

The Glicks' primary claim is that Klein fraudulently induced them to invest $433,000 in Bleachers by making certain false and fraudulent statements. In briefing the issue of fraud, both parties focused on Wyoming law, which I will apply.[192]

---

[191] Tr. 55-59 (Tim); *accord* 134-35 (Renee).

[192] Pls.' Post-Trial Opening Br. 40; Defs.' Post-Trial Answering Br. 48.  Where a choice of law provision does not govern, Delaware courts generally follow the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws when assessing tort claims. *Gloucester Hldg. Corp. v. U.S. Tape and Sticky Prods., LLC*, 832 A.2d 116, 124 (Del. Ch. 2003).  Here, Wyoming has the most significant relationship to the events because (1) the relationship between the parties was centered there, (2) both parties have residences there, (3) some of the challenged representations were made there, and (4) the injury to the Glicks occurred there. *See Restatement (Second) of Conflict of Laws* § 145(2).

Under Wyoming law, three elements must be established by clear and convincing evidence to prove a claim of fraudulent inducement:

> A plaintiff alleging fraudulent inducement carries the burden of showing by clear and convincing evidence that 1) the defendant made a false representation intending to induce action by the plaintiff; 2) the plaintiff reasonably believed the representation to be true; and 3) the plaintiff suffered damages in relying on the false representation.[193]

Clear and convincing evidence requires a showing of "the kind of proof which would persuade a trier of fact that the truth of the contention is highly probable."[194]

To satisfy the first element of a fraudulent inducement claim, a plaintiff must provide sufficient evidence that the defendant made a false factual statement[195] relating to a material fact[196] with either "knowledge of its falsity," or "aware[ness] that he did not have a basis for making the statement" to induce action.[197] To satisfy the second element, a plaintiff must prove that its belief in, and reliance on, the defendant's representation was reasonable under the facts presented.[198] To satisfy

---

[193] *Claman v. Popp*, 279 P.3d 1003, 1016 (Wyo. 2012) (citing *Bitker v. First Nat'l Bank in Evanston*, 98 P.3d 853, 856 (Wyo. 2004)).

[194] *Alexander v. Meduna*, 47 P.4d 206, 216 (Wyo. 2012) (citation omitted).

[195] *Sundown, Inc. v. Pearson Real Estate Co., Inc.,* 8 P.3d 324, 331 (Wyo. 2000) (holding that "any false representation must relate to a matter of fact.").

[196] *Universal Drilling Co., LLC v. R & R Rig Serv., LLC*, 271 P.3d 987, 998 (Wyo. 2012) ("[T]he injured party must show that the false representation pertained to a material fact.").

[197] *Excel Const., Inc. v. HKM Eng'g, Inc.,* 228 P.3d 40, 48-49 (Wyo. 2010).

[198] *Dewey v. Wentland*, 38 P.3d 402, 413 (Wyo. 2002).

the third element, a plaintiff must show that its reliance on the misrepresentation was the cause of the harm.

The Glicks contend that Klein made essentially seven false or fraudulent statements to induce their investment in Bleachers:

1. That Bleachers was "white hot";

2. That Bleachers had a huge opportunity in the Australian market;

3. That Bleachers had a huge opportunity to provide services to Division III schools;

4. That Klein was so sure that the investment in Bleachers would be successful that he would personally guarantee the investment and repurchase the Glicks' shares if Bleachers was not successful;

5. That Bleachers did not need the money, and that Klein was permitting the Glicks to participate in Bleachers as a friend;

6. That the value of Bleachers had doubled between the Glicks' first investment in Bleachers and their second, follow-on investment; and

7. That a very sophisticated investor, Morris Offit, was going to invest $150 million in Bleachers.[199]

The first three statements fail to satisfy the first element of a fraudulent inducement claim because they do not constitute false statements of *fact*. Rather, the assertions that Bleachers was "white hot" or had "huge opportunities" in Australia or in the

---

[199] Pls.' Post-Trial Reply Br. 1.

Division III college market amount to expressions of intention, hope, or opinion about future matters that are not actionable under Wyoming law.[200]

The fourth and fifth statements go together. The sixth and seventh statements occurred after the Glicks made their first investment of $250,000, and thus are relevant only to their decision to make the second investment of $183,000. I discuss each of these statements below.

## 1.     The Personal Guarantee

The Glicks contend that Klein represented to Tim that:  he was so confident about Bleachers' prospects that he would personally guarantee them that they would not lose money, he would repurchase their shares if anything went wrong, and he was offering the investment essentially as a "favor" to his friends so that Tim would have "skin in the game" to participate in a joint venture with Klein.  Klein vehemently denies making any such statements, although he admits to telling Tim

---

[200] *See Bushnell v. Elkins,* 245 P. 304, 308 (Wyo. 1926) (fraud case could not stand where representations complained of "were merely opinions, or expressions of hope, or expectation that the business of the corporation would be successful")*; Sundown,* 8 P.3d at 331 ("opinions [] are not actionable under the law"); *Farmers' Lumber Co. v. Luikart*, 256 P. 84, 86 (Wyo. 1927) (quoting *First Nat'l Bank v. Swan*, 23 P. 743, 750 (Wyo. 1890)) (a representation "'which relates to the future, or which depends upon contingencies which may or may not happen, furnishes no foundation for a claim of fraud or deceit'").  These statements also resemble "puffing" that should be viewed as opinion and "discounted as such by the buyer" due to "broad, vague, and commendatory language."  W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 109, at 756–57 (5th ed.1984).

that he needed to have "skin in the game" for the real estate venture that never materialized.[201] The issue boils down to one of credibility and the parties' conduct.

I find it highly probable that Klein made the personal guarantee representations to Tim as Tim testified.[202] Tim was a very credible witness and I credit his specific testimony on this issue, which is corroborated by Renee's testimony that Tim told her about the personal guarantee at the time. Tim's testimony is further corroborated by the fact that when he invoked the guarantee in August 2015, Klein did not take issue with Tim's request to be bought out, which one would expect if Klein had never promised to do so. To the contrary, consistent with having made the representation, Klein said that the Glicks' shares "would be purchased at the – at the next event."[203] A few months later, in December 2015, Klein again did not challenge the notion that he had a responsibility to repurchase the Glicks' shares, but instead told Tim that he would buy out the Glicks shortly after the year-end.[204] Klein was not a credible witness and I do not credit his denial of the personal guarantee.

The personal guarantee representation was clearly material to the Glicks and induced their investment because it was made to assuage their stated reservations

---

[201] Tr. 185 (Klein).

[202] *See supra* Section I.H.

[203] Tr. 65 (Tim); JX050.

[204] Tr. 65-66 (Tim).

36

and nervousness about investing most of their life savings in Bleachers. Both of the Glicks testified credibly about how important the guarantee was to their decision to invest with Klein.[205]

Although the general rule under Wyoming law "is that fraud ordinarily cannot be founded upon a representation which is promissory in nature," there is an exception that applies when a person makes such a representation with no intention of performing the promise:

> This general rule, however, is subject to an exception to the effect that if the representation, although promissory in nature, is made with no intention of performing it or with a present intention not to perform, it may then serve as a foundation for an action in fraud; one of the justifications for the exception being that there does exist a misrepresentation of a present fact, that is, the intention of the promissor.[206]

Consistent with this doctrine, Klein made no argument in his post-trial brief that the personal guarantee could not form the basis of a claim for fraudulent inducement because of its promissory nature.

I also find it highly probable that Klein never intended to perform on the guarantee. This is borne out by his contemporaneous and subsequent conduct. By the time he made the personal guarantee representations to Tim, Klein had decided that he did not trust Tim and wanted to work him out of his home construction

---

[205] JX099 at 52-53 (Renee Dep.); Tr. 127 (Renee); Tr. 89 (Tim).

[206] *Johnson v. Soulis*, 542 P.2d 867, 872 (Wyo. 1975).

project.[207]  Yet during this same period, Klein directed Tim to inflate the draws on the construction loan, which enriched Klein and gave him leverage over Tim.  It is inconceivable in my view that Klein ever had any intention to honor an oral guarantee to buy back the Glicks' investment in Bleachers when, at the time he made the promise, Klein was leading Tim on about undertaking a real estate joint venture that he had no apparent intention of pursuing[208] and was putting Tim in a financial straightjacket on his home construction project.

Klein's subsequent conduct, which may be considered under Wyoming law,[209] further supports this conclusion.  Specifically, after Tim asked to be bought out in the latter part of 2015, Klein had several opportunities to return the Glicks' investment with relative ease, without using his own money and despite the illiquidity of the KF Pecksland shares, since he sold shares of KF Pecksland to four other investors for $1.2 million from October 2015 to April 2016.  The obvious reason Klein did not utilize any of those opportunities to arrange a purchase of the Glicks' shares is because he never had any intention of buying them back.

---

[207] JX096 at 83-84 (Klein Dep.).

[208] I discredit Klein's trial testimony that his interest in the real estate joint venture was sincere at this point (*see* Tr. 183-85 (Klein)) given his admission in his deposition that he did not trust Tim by early 2015 (*see* JX096 at 83-84 (Klein Dep.)) and given Klein's overall lack of credibility.

[209] *See Positive Progressions, LLC v. Landerman* 360 P.3d 1006, 1015-16, 1018 (Wyo. 2015) (considering subsequent conduct as evidence of intention not to perform).

For the reasons explained above, I find that the Glicks have established by clear and convincing evidence that Klein intentionally made a false representation when he promised to repurchase the Glicks' shares in order to induce the Glicks to invest in Bleachers. Thus, the Glicks have satisfied the first element of a claim for fraudulent inducement under Wyoming law.

With respect to the second element of the claim, the almost "too good to be true" nature of the personal guarantee initially gave me pause about the reasonableness of the Glicks' belief in Klein's representation. One naturally would be skeptical that a financial investment could have no downside risk—other than the risk of Klein reneging on his word. But the circumstances under which the representation was made firmly convince me otherwise.

As discussed above, Klein expressed great bullishness on Bleachers' prospects, touting that it was "white hot," had huge opportunities in Australia and in the Division III college market,[210] and repeatedly telling Tim how confident he was that it would make money.[211] He also spent a lot of time with Tim, and to a lesser extent with Renee, talking about an array of personal and business matters to gain

---

[210] Tr. 173-174, 263 (Klein); Tr. 45-46, 66-67 (Tim).

[211] Tr. 72 (Tim) ("And he told me that we were going to make a lot of money. 'Don't worry about it.' He was so certain of it that he personally guaranteed it."); Tr. 89 (Tim) (discussing how Klein had told Tim a "number of times that he -- he was so sure of Bleachers, that we were going to make money, and a lot of money, that he -- he would personally guarantee it."); Tr. 90 (Tim) ("Mr. Klein told me that he would personally guarantee the investment. He told us that we were going to make millions of dollars. I trusted him.").

the Glicks' confidence. Against this backdrop, Klein pitched selling them a piece of Bleachers as something he was doing "as a favor" out of friendship so that they could have "skin in the game" and participate in a promising real estate joint venture with him.[212] Tim and Renee both credibly testified that they trusted Klein, that the guarantee was important to their decision to invest, and that they were appreciative of what he was doing for them.[213]

Adding credence to the fact that the promise was done out of friendship, and to help Tim raise money for their venture, is the fact that Klein continued to express his desire to help Tim out by arranging for Tim to work with Offit just as the Glicks were being asked to sign the First Purchase Agreement on April 14, 2015. Starting at 6:45 a.m. that morning, Klein sent Tim several e-mails suggesting that Offit would hire Tim for the demolition and construction of a new home. Klein's first e-mail reported that "[Offit] will pay you a supervisory fee of 15k plus travel (youll [*sic*] stay at my home)."[214] Six minutes later, Klein stated "funny, [Offit] asked if you could do a design build," and provided information about the bids Offit had received. Tim replied that he could not "see why *we* couldn't beat that."[215] At 9:01 a.m., just

---

[212] *See* Tr. 39 (Tim) (discussions about starting a joint venture began "late 2014 and then really kind of February, March, April of 2015, we really -- we spoke quite often about real estate development and what we might be able to do together as a team in Jackson").

[213] Tr. 39-40, 43-44, 57-58, 89 (Tim); Tr. 127 (Renee); JX099 at 30-31, 37 (Renee Dep.).

[214] JX014.

[215] JX014 (emphasis added).

fifteen minutes after sending the Glicks the First Purchase Agreement,[216] Klein sent

Tim yet another e-mail, explaining that the job would be lucrative and suggesting

that Tim already had the job: "[Offit] would take a blended deal at 16% and at

10,000 at 450 sqft that's 720k fee. . . either way its [*sic*] your job . . i cant take a cent

as hes [*sic*] a partner."[217]  And, four minutes later, at 9:05 a.m., Klein continued to

tout Bleachers' prospects by forwarding Tim an email from Offit saying that the

chairman of the Gilman School board was "intrigued with Bleachers."[218]

The Glicks were an easy mark for Klein's pitch.  Although Tim had achieved

a degree of success as a home builder, he and Renee were not sophisticated investors,

and Klein knew it.  The emails and text messages the Glicks exchanged with Klein

displayed an obvious naiveté about financial matters.[219]  In other words, the personal

guarantee was offered to the Glicks out of ostensible friendship by someone who

portrayed himself as extremely wealthy and had the resources to make such a

---

[216] JX012 (email from Klein to Tim at 8:47 a.m. on April 14, 2015, forwarding copy of First Purchase Agreement for the Glicks to sign).

[217] JX014.

[218] JX015.

[219] *See* JX010 (asking if there was a "cliff note or 'for dummies' version of this document [warrant agreement]"); JX023 (Tim asking Klein whether "ESPN [would] be considered your competition"); JX030 (in response to Second Purchase Agreement, Tim noted how the "numbers seem to make sense to me… at least the amount Renee and I have to put in and the purchase price."); JX008 Glicks599-601 (discussing how the Glicks trust Klein "unconditionally" and will "be family with you for the next 55 years"); Tr. 16-17 (Tim) and Tr. 185, 261 (Klein) (discussing how Klein walked Tim through hours of construction financing and discussed how to improve Tim's business model).

representation credible.   The sale of shares and guarantee also were offered out of an expressed interest in cultivating a larger relationship with Tim in order to make possible a real estate venture that could be mutually beneficial, and so did not appear to be an act of mere charity.  Given this context, I find that the Glicks have met their burden to prove by clear and convincing evidence that their belief in Klein's representation that he would personally guarantee their investment in Bleachers was reasonable.

Wyoming law bars recovery if the complaining party "blindly relies upon a representation, the falsity of which would be obvious to him upon a cursory examination or investigation."[220]  It is unclear, however, what evidence the Glicks could have uncovered to show that Klein was unwilling to repurchase their shares. Other than invoking language from the First Purchase Agreement, discussed below, Klein points to none.  In short, there was no "available evidence of a defect" to put the Glicks on notice that Klein's statements about the personal guarantee were false,[221] and nothing in the record suggests that "investigations would have easily disclosed the true situation."[222]  Indeed, the only evidence of Klein's true intentions

---

[220] *Dewey*, 38 P.3d at 413.

[221] *Claman,* 279 P.3d at 1016-18 (finding reliance to be unreasonable where plaintiff who sued for subsidence-causing defects of a house had the opportunity to view the property, the defects were readily visible, and where defendant truthfully disclosed to plaintiff in property condition statement that house was in subsidence area).

[222] *Farmers'*, 256 P. at 86.

was in Klein's control, and his willingness to make misrepresentations is clearly established.

Klein's main defense is that the Glicks could not have reasonably relied on a representation that he would repurchase their investment because the purchase agreements they signed "purport to fully express the parties' accord [and] nothing in them provides for a repurchase."[223] Klein focuses in particular on a representation in the First Purchase Agreement stating that the purchaser could afford "a complete loss" of the value of the purchased shares and is "able to bear the economic risk" of holding such purchased shares "for an indefinite period."[224]

The record reflects, however, that Klein portrayed the purchase agreements he sent the Glicks, which were generic in nature, to be a mere "formality."[225] This

---

[223] Defs.' Post-Trial Ans. Br. 60.

[224] *Id.* (quoting JX016 § (B)(3)(d)). Both of the purchase agreements contained generic integration clauses but did not contain an express disclaimer from the purchasers of reliance on representations made before signing. *See* JX016 § (E)(2); JX036 Glicks211 § (E)(2).

[225] Tr. 46, 86 (Tim) (testimony that Klein repeatedly referred to agreements as a "formality"); *cf.* JX010 (sending e-mail "warrant offer" to the Glicks, and stating that "this may be the shortest form . they usually run 12 plus pages . Lemme walk you thru it and see if we can simplify further . I'm a big fan of less complicated."); JX012 (e-mail from Klein enclosing the First Purchase Agreement in which the only text in the body was "you and renee should sign page 4 and return by pdf…KEEP THE ORIGINAL FOR YOUR RECORDS…." and which failed to include Exhibits A and B referred to in the First Purchase Agreement); JX030 (e-mail on May 26, before the Glicks entered into Second Purchase Agreement, where in response to Glicks statement that "numbers seem to make sense" Klein responded "its correct…i'll have [my attorney] lipari issue the shares"); JX036 (e-mail enclosing the Second Purchase Agreement reflecting that Klein was forwarding to Tim "to cut down on legal expense").

is confirmed by the lack of any negotiation over their terms and the slipshod manner in which the purchase agreements were prepared. For example, Klein testified that the First Purchase Agreement was inaccurate, which led to it being replaced by the Second Purchase Agreement.[226] And, reflective of its lack of importance, the key representation in the First Purchase Agreement on which Klein relies—that the purchaser could afford the risk of loss and hold the shares indefinitely—was omitted from the Second Purchase Agreement.

In circumstances similar to this case, the Supreme Court of Wyoming in recent years has disregarded the express terms of a contract to protect against fraud. In 2015, for example, in *Positive Progressions, LLC v. Landerman*, a plaintiff proved at trial that she had been fraudulently induced to sign a contract where she "had reason to and did rely on the representations of" a party who held himself out as an "ethical and responsible businessman."[227] While "especially conscious of parties' freedom to contract," the Supreme Court of Wyoming nevertheless declined to bar her claim based on the written agreement, opting to adopt the law of a sister state in order to protect against fraudulent conduct:

We are of the same opinion as the Supreme Court of Idaho:

---

[226] Tr. 201-02 (Klein). Further, many documents purported to be prepared and attached to the First Purchase Agreement were not. *See* JX016.

[227] 360 P.3d at 1018. The plaintiff in *Positive Progressions* did not read the final agreement she signed at all.

> While normally the terms of a written contract will control, Idaho law firmly allows that "[f]raud in the inducement is always admissible to show that the representations by one party were a material part of the bargain." "[A]greements and communications prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish fraud." Fraud vitiates the specific terms of the agreement and can provide a basis for demonstrating that the parties agreed to something apart from or in addition to the written documents.[228]

Just last year, in *Rogers v. White*, the Supreme Court of Wyoming similarly held that "[w]hen one party uses fraudulent or intentional misrepresentations or nondisclosure to induce the other party into a contract, an 'as is' clause or disclaimer does not bar the induced party from recovery."[229] Klein did not identify any contrary Wyoming authority suggesting that a generic integration or disclaimer clause would prohibit recovery for fraud.

Here, similar to *Positive Progressions*, the Glicks had reason to and did rely on the representations of someone who held himself out as a friend doing them a favor but, unbeknownst to them, intentionally deceived them into giving him their life savings based on a promise to repurchase their shares that he never intended to keep. In my opinion, Wyoming law would not bar a fraudulent inducement claim under these circumstances based on generic representations in an agreement the parties viewed as a formality. As the *Rogers* court explained, "'[a] perpetrator of

---

[228] *Id.* at 1019 (citations omitted).

[229] 366 P.3d 1264, 1271 (Wyo. 2016) (citations omitted).

fraud cannot close the lips of his innocent victim by getting him blindly to agree in advance not to complain against it.'"[230]

Finally, the Glicks have proven that they "suffered damages in relying on the false representation" Klein made to them.[231]  As a direct result of Klein's refusal to honor the guarantee, the Glicks lost a total of $433,000 and are entitled to consequential damages for that amount.[232]

## 2.    The Offit and "Doubled Value" Representations

The Glicks contend that Klein made two additional representations that fraudulently induced them to make the second investment of $183,000:  (1) that a very sophisticated investor, Morris Offit, was going to invest $150 million in Bleachers imminently; and (2) that the Glicks' Bleachers stock had doubled in value in the few weeks since they made their first investment.  It is not necessary to parse the record to decide whether the Glicks met their burden to demonstrate that Klein made these representations, which indisputably would have been false.  Even assuming for the sake of argument Klein did, the Glicks have failed to show by clear

---

[230] 366 P.3d at 1271 (quoting *Snyder v. Lovercheck*, 992 P.2d 1079, 1086 (Wyo. 1999)).

[231] *Claman*, 279 P.3d at 1016 (citing *Bitker*, 98 P.3d at 856).

[232] Wyoming law recognizes that consequential damages are an appropriate remedy for fraudulent inducement.  *See Jurkovich v. Tomlinson*, 905 P.2d 409, 412 (Wyo. 1995) (discussing how compensatory damages appropriate remedy for fraudulent inducement and denying rescissionary damages); *Alexander*, 47 P.3d at 217 (awarding compensatory damages in fraudulent inducement case).

and convincing evidence that they reasonably relied on these representations and thus cannot sustain their fraudulent inducement claim based on them.

As noted above, under the law of fraudulent inducement in Wyoming, "one cannot recover if he blindly relies upon a representation, the falsity of which would be obvious to him upon a cursory examination or investigation."[233] Here, in the face of factual assertions about a specific sum Offit was going to invest in Bleachers imminently, and about a dramatic increase in the value of their initial investment in Bleachers in a short period of time, the Glicks did not attempt to conduct even the most cursory form of investigation.

Unlike the situation with the personal guarantee, there were obvious ways the Glicks easily could have investigated these particular representations. For instance, concerning Offit's putatively imminent $150 million investment, the Glicks could have asked Klein to provide a copy of a document reflecting the commitment or Tim could have spoken to Offit himself to confirm it. Tim visited Offit's property in

---

[233] *Dewey*, 38 P.3d at 413; *see also White v. Ogburn*, 528 P.2d 1167, 1171 (Wyo. 1974) ("We do not say that plaintiffs could not rely upon representations made to them by the defendants, but they could not blind themselves to observe the readily available facts and place reliance upon such alleged misrepresentations without making a diligent inquiry of these facts."); *Schaffer v. Standard Timber Co.,* 331 P.2d 611, 615 (Wyo. 1958) ("persons now complaining to have been misled were obligated to use the ordinary means of information available to them . . . under the circumstances."); *Farmers'*, 256 P. at 86 (*quoting First Nat'l Bank*, 23 P. at 750 ("A party . . . cannot, when the opportunity is before him, and there is nothing in the situation of the parties to prevent investigation, decline to prosecute a reasonably diligent inquiry, refuse to exercise his own judgment, and then be heard to complain [of fraud].").

Greenwich in early May and had spoken to Offit on the phone about the demolition project.[234] Tim had access to Offit and was in a position to make the inquiry, but he never tried.[235]

As to the doubling of the value of the Glicks' initial investment, Tim could have asked for some documentation reflecting the valuation of the Bleachers shares, such as a financial statement or evidence of recent sales at a higher valuation. At a minimum, Tim could have asked Klein to explain what had happened during the two and a half weeks since the Glicks made their initial investment that caused it to double in value in such a short period of time.

Had the Glicks made any attempt to kick the tires about these representations, it is likely that they would have become suspicious about their veracity. But given their failure to make any effort to investigate the truth of the doubling and Offit investment representations, I cannot find that the Glicks have established by clear and convincing evidence under Wyoming law that their reliance on these representations was reasonable.

---

[234] Tr. 47, 91-92 (Tim); Tr. 200-201 (Klein).

[235] Tr. 92 (Tim). Tim testified vaguely that "Klein always was very particular on how [he] spoke to Mr. Offit," but he did not say that he had been instructed not to do so. *Id.*

## B. The Negligent Misrepresentation and Constructive Fraud Claims

Shortly before and after trial, the Glicks sought to introduce two additional claims that were not pled in their complaint, for negligent misrepresentation and constructive fraud.[236] The parties disagree over whether these claims were tried by implied consent of the parties and thus may treated as if they had been raised in the pleadings under Court of Chancery Rule 15(b). I do not reach this issue and need not analyze these claims for two reasons.

First, because the Glicks have proven their entitlement to an award of damages for the full amount they invested with Klein under their claim for fraudulent inducement, they would not be entitled to any further recovery under either theory.[237]

Second, with one exception, the Glicks have not identified any representation or concealment that could serve as an additional basis for recovery under either theory. The exception is the admittedly false representation Klein made to Tim in emails on May 20 and 31, 2015 that Bleachers had entered into contracts with multiple schools in Australia.[238] On this score, Klein blames Richard Stokes of the ABSA for sending bad information to him.[239] Klein could be liable for negligent

---

[236] *See* Pls.' Pre-Trial Br. 29-30 (asserting equitable fraud claim); Pls.' Post-Trial Opening Br. 46-49 (asserting constructive fraud and negligent misrepresentation claim).

[237] *See Brandin v. Gottlieb*, 2000 WL 1005954, at *1 (Del. Ch. July 13, 2000) (declining to reach breach of fiduciary duties where party prevailed on contractual claims).

[238] JX028 (May 20, 2015 e-mail); JX032 (May 31, 2015 e-mail).

[239] Tr. 264-267 (Klein) (quoting JX096 at 136-138 (Klein Dep.)).

misrepresentation if he failed to exercise reasonable care before forwarding this information to Tim and if the Glicks relied on it.[240] The Glicks, however, already had wired the funds for their second and final investment on May 14, before Tim received the May 20 and 31 emails from Klein, and thus would not be able to establish that they justifiably relied on these representations.

## C. The Breach of Fiduciary Duty Claim

In Count II of their complaint, the Glicks assert a claim for breach of fiduciary duty against Klein as the manager of KF Pecksland. The manager of a Delaware limited liability company owes the traditional fiduciary duties of loyalty and care to its members unless the LLC agreement provides otherwise.[241] The KF Pecksland LLC Agreement does not modify or eliminate the manager's fiduciary duties.[242] Thus, Klein owed a fiduciary duty to the Glicks once they became members of KF Pecksland. Defendants do not contend otherwise.

---

[240] *See Hulse v. First Am. Title Co. of Crook Cty.*, 33 P.3d 122, 138 (Wyo. 2001) (citation omitted) ("One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.").

[241] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 856 (Del. Ch. 2012), *aff'd,* 59 A.3d 1206 (Del. 2012); *see also* 6 *Del. C.* § 18-1101.

[242] JX036 Glicks202-05.

The relief the Glicks seek for their fiduciary duty claim is an award of money damages.[243]  Thus, to sustain their claim under Count II, they have the burden to prove, by a preponderance of the evidence, not only that Klein breached a fiduciary duty owed to them, but that they suffered damages as a result of the breach.[244]  An award of "[d]amages cannot be speculative or uncertain . . . but must be at least based on a reasonable estimate."[245]

The Glicks contend that Klein breached his fiduciary duties in four respects. First, they assert that Klein failed to cause KF Pecksland to maintain appropriate books and records, citing Klein's admission that KF Pecksland has no financial statements, balance sheets, profit and loss statements, meeting minutes, or resolutions.[246]  Klein's failure to maintain such basic corporate records is egregious and suggestive of gross negligence that would sustain a breach of the duty of care,

---

[243] PTO § IV.A.3.

[244] *See Hampshire Grp., Ltd. v. Kuttner,* 2010 WL 2739995, at *50 (Del. Ch. July 12, 2010) (discussing need for causation and sufficiently quantifiable harm for damages in breach of fiduciary duty case).

[245] *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *20 (Del. Ch. Sept. 3, 1996*), aff'd*, 692 A.2d 411 (Del. 1997) (quotation and citation omitted) (declining to award of damages in suit alleging mismanagement).

[246] JX081 ¶ 10 (Answer to Books and Records Compl.).  Klein also admitted in his answer that KF Pecksland had no tax returns, but he testified at trial they had been filed "a few weeks ago."  Tr. 282-83 (Klein)

and perhaps bad faith.[247] The Glicks, however, put forward no evidence to quantify how Klein's alleged mismanagement harmed them apart from seeking the return of the $433,000 they paid for interests in KF Pecksland as a result of Klein's fraudulent conduct. More broadly, the Glicks failed to proffer any expert or lay evidence on the issue of damages they suffered directly—as opposed to harm the LLC suffered— as a result of any of Klein's alleged breaches of fiduciary duty.

Second, the Glicks contend that Klein breached his fiduciary duties by admittedly using KF Pecksland's funds as his "personal checking account."[248] KF Pecksland received millions of dollars from the scheme Klein orchestrated to inflate the draws on the construction loan for his Jackson residence, which Klein took for himself.[249] Once again, however, the record is devoid of evidence showing how the Glicks personally suffered damages as members of KF Pecksland as a result of this scheme as opposed to harm that the LLC may have suffered.

Third, the Glicks assert that Klein usurped a corporate opportunity by selling his personal interests in KF Pecksland to certain individuals instead of selling to them Bleachers shares held by KF Pecksland, which would have resulted in KF Pecksland receiving the proceeds of such sales. Apart from failing to prove they

---

[247] The KF Pecksland LLC Agreement does not exculpate its managers for breaches of the duty of care. *See* JX036 Glicks202-05.

[248] Tr. 228-231 (Klein).

[249] JX066; Tr. 229 (Klein).

suffered damages personally as a result of this conduct, the Glicks failed to establish that an opportunity was available to KF Pecksland. I have my suspicions about what happened to these individuals, but the fact of the matter is that there is no evidence in the record about whether they were interested in acquiring Bleachers stock or an interest in KF Pecksland.

Finally, the Glicks assert that Klein breached his fiduciary duties by obligating KF Pecksland to pay $6 million to Payton Lane, another of Klein's entities, via a promissory note exchanged for a subordinated mortgage on Klein's Jackson residence. This was a plainly self-interested transaction, which has all the indicia of being unfair to KF Pecksland. Apparently recognizing as much, Klein testified that the transaction is being unwound.[250] Whether or not that is true cannot be discerned from the record, but what is evident is that the Glicks submitted no evidence quantifying the harm this transaction caused them.

In sum, the Glicks' fiduciary duty claim raises many troubling issues concerning Klein's conduct as a fiduciary of KF Pecksland. The evidence suggests that Klein could be liable for harm caused to the LLC by using its accounts for personal purposes, diverting corporate opportunities to himself, and unfairly encumbering KF Pecksland with a $6 million promissory note. But the Glicks failed

---

[250] Tr. 222 (Klein).

to submit evidence to establish that they were harmed directly by Klein's alleged breaches of fiduciary duties, and they did not seek to assert a derivative claim on behalf of KF Pecksland. It is understandable why the Glicks did not litigate each of these issues to the ground given the amount at stake in this case, but the bottom line result is that the Glicks failed to submit sufficient proof to establish a right to damages under Count II of their complaint.

## D. Attorney's Fees

The Glicks devoted just one sentence in their post-trial briefs to explain the basis for their request for attorney's fees, which they say is "premised on Klein's egregious misconduct, throughout the proceedings."[251] The request is denied.

Under the "American Rule," courts "do not award attorneys' fees to a prevailing party absent some special circumstance."[252] The "American Rule would be eviscerated if every decision holding defendants liable for fraud or the like also awarded attorney's fees."[253] The "quite narrow exception" to the American rule instead "is applied in only the most egregious instances of fraud or overreaching."[254]

---

[251] Pls.' Post-Trial Reply Br. 21.

[252] *See Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997); *aff'd*, 720 A.2d 542 (Del. 1998).

[253] *Barrows v. Bowen,* 1994 WL 514868, at *2 (Del. Ch. Sept. 7, 1994) (Allen, C.).

[254] *Arbitrium*, 705 A.2d at 231.

To be sure, Klein should be held to account for the fraudulent conduct for which this decision finds him liable. The Glicks, however, failed to prove many of the grounds for their fraud claim and did not prevail on their fiduciary duty claim. In short, this litigation was hard fought, hotly disputed, and involved some truly disturbing conduct, but it did not rise to the level of such egregiousness so as to warrant deviation from the American Rule. Accordingly, the Glicks' request for an award of attorneys' fees is denied.

## IV. CONCLUSION

For the reasons explained above, the Glicks are entitled to judgment in their favor on Count III in the amount of $433,000, plus pre- and post-judgment interest, and their costs as the prevailing party on the core issue in this case.[255] Count I is dismissed as moot, and judgment shall be entered in Klein's favor on Count II. The parties are directed to submit a form of final judgment within five business days of the date of this opinion.

**IT IS SO ORDERED.**

---

[255] *See FGC Holdings Ltd. v. Teltronics, Inc.*, 2007 WL 241384, at *17 (Del. Ch. Jan. 22, 2007) ("For purposes of Rule 54(d), the 'prevailing party' is the party who successfully prevails on the merits of the main issue.").